IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

STEPHEN WILLOUGHBY,

                    Defendant.

CRIMINAL CASE NO.

1:11-CR-0280-CAP-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court is Defendant Stephen Willoughby's motion [Doc. 13] to suppress evidence seized and statements he made on February 13, 2011, at the Hartsfield-Jackson International Airport as he made entry into the United States after arriving on an international flight from London.  An evidentiary hearing was held on the motion to suppress on August 4, 2011.[1]  [Doc. 19].  In his post-hearing brief in support of the motion to suppress, Defendant contends that the border inspection and questioning that he was subjected to was "non-routine" and, therefore, that the warrantless search of his person and luggage violated his Fourth Amendment rights and that the questioning, without being advised of Miranda rights, violated his Fifth

---

[1]Citations to the transcript are:  (Tr. at ).

Amendment rights.  [Doc. 20].  The Government responds opposing the motion to suppress contending that the searches of Defendant's person and luggage constituted a routine border inspection, that the questioning likewise was part of a routine border inspection, and that Defendant was not in custody so as to require <u>Miranda</u> warnings. [Doc. 21].  After consideration of the totality of the circumstances and applying binding and persuasive legal authority, the court recommends denying Defendant's motion to suppress.

## I.     Facts

On February 13, 2011, at the Hartsfield-Jackson International Airport ("HJIA"), Customs and Border Protection ("CBP") Officer Christopher Morris was observing passengers deplaning from an international flight from London in the early evening hour.  (Tr. at 4-6, 23).  The passengers were arriving at Terminal E, the international concourse.[2]  (Tr. at 6).  As a part of CBP officers duties, they are tasked with

---

[2]On the top floor of Terminal E's concourse, arriving international passengers proceed through an immigration or passport checkpoint where returning U.S. citizens must present their passports and CBP custom's declaration form and where foreign travelers must also present their I-94 forms.  (Tr. at 7-9, 14-15; Gov't Ex. 1a).  In addition to verifying these forms, the CBP officers make random inquiries as to the nature of the travel and destination.  (Tr. at 8).  If there are no issues requiring a passenger to be referred to secondary inspection (which rarely occurs with returning U.S. citizens), the travel documents, including the CBP declaration form after being stamped, are returned to the passenger, who then proceeds downstairs to the baggage

2

protecting the United States from high risk arriving passengers who are engaged in criminal violations and bulk cash and narcotics smuggling into the country.  (Tr. at 6-7).  Part of the officers' routine duties include screening arriving passengers and conducting searches of their persons and luggage for any items that constitute contraband, currency violations, or fraudulent travel documents.  (Tr. at 7-8, 13).

Officer Morris first encountered Defendant and his wife and son on the jet way as they deplaned from their international flight.[3]  (Tr. at 19, 23, 59).  The officer approached Defendant and asked for his identification and made routine travel inquiries.  (Tr. at 20, 63).  After identifying Defendant, the officer returned his documents and moved away but kept Defendant under surveillance as he proceeded to the immigration/passport control checkpoint.  (Tr. at 19-21, 64).  Defendant and his

control area of Customs.  (Tr. at 8-10, 12).  On the lower level, all passengers must retrieve checked luggage and then proceed through another CBP checkpoint where they turn in the stamped CBP declaration form.  (Tr. at 10-11, 16-18; Gov't 1b).  The checkpoint officer may also ask for and examine the traveler's passport at this inspection station and may make routine inquiries of the passengers.  (Tr. at 75). Baggage control also has a secondary inspection area, one for agriculture related inquiries and one for baggage inspections, pat downs and interviews.  (Tr. at 11, 13, 18).  If a traveler is not referred to secondary at this point, he or she exits from the Custom's area to proceed through TSA screening for entry into the rest of the airport. (Tr. at 12).

[3]Although the officers had been notified to watch for Defendant, they did not have any intelligence that he was carrying in excess of $10,000.  (Tr. at 59, 65).

family waited in line approximately fifteen to twenty minutes before presenting their passports, and at approximately 6:57 p.m., Plaintiff presented the CBP customs declaration form to the officer at the checkpoint.  (Tr. at 21-22; Def. Ex. 1).[4]  The officer examined the documents, stamped the CBP declaration form,[5] and returned the documents to Defendant.  (Tr. at 22).  Defendant and his family then proceeded downstairs to baggage control.  (Tr. at 22-23).

As they waited to claim their checked luggage,[6] Officer Morris and CBP Officer Regas approached Defendant and his family and requested to examine Defendant's passport and CBP declaration form.  (Tr. at 23-24, 68).  Officer Morris inspected the CBP declaration form handed to him by Defendant (Gov't Ex. 2) and asked Defendant

_____

[4]Although there was some confusion at the hearing as to whether this exhibit indicated that the plane landed at 18:57, that is, 6:57 p.m., or that was the time Defendant and his family were being screened at the immigration checkpoint (Tr. at 60-61, 100), based on the sequence of events that evening and on the exhibit itself, which indicates that a Custom's officer made a Treasury Enforcement Communication System ("TECS") inquiry at 18:57 (Doc. Ex. 1), the court finds that the exhibit denotes the time when the CBP officer at the immigration checkpoint made an inquiry based on Defendant's documents being presented for examination.

[5]This form was the same form subsequently presented to Officer Morris.  (Tr. at 22, 63, 65-66).

[6]Officer Morris estimated that approximately thirty to forty minutes had elapsed since first encountering Defendant on the jet way.  (Tr. at 51).

4

routine questions, such as, purpose of his travel and number of pieces of checked luggage.  (Tr. at 24-25, 70).  One of the CBP officers' duties is to verify the amount of currency flowing into and out of the United States because the transportation of currency could be linked to other criminal activity.  (Tr. at 25).  One of the questions on the CBP declaration form asks whether the traveler is carrying in excess of $10,000. (Tr. at 26-28; Gov't Ex. 2, 2a).  On the form handed by Defendant to Officer Morris, that question was checked, no.  (Tr. at 28; Gov't Ex. 2).  Officer Morris asked Defendant about the amount of currency he was traveling with in order to obtain a "binding declaration" and to allow Defendant to amend the form if any answers are incorrect.  (Tr. at 28).  Defendant "very quickly" responded, "$100."  (Tr. at 29). Officer Morris asked Defendant to write on the back of the form the amount of currency he was carrying and then to sign the form.  Defendant did so.  (Tr. at 29, 71-72; Gov't Ex. 2).  The officer returned Defendant's passport and the CBP declaration form and walked away.  The officers maintained physical surveillance of Defendant. (Tr. at 30, 73).

After Defendant and his family claimed their checked luggage, they proceeded to the baggage checkpoint.  Defendant handed his passport and the CBP declaration form to the officer at the checkpoint.  (Tr. at 30-31, 36, 74-75).  At that point, Officer

5

Morris approached, obtained Defendant's passport and the CBP declaration form from the officer at the checkpoint and asked Defendant and his family to follow him to secondary baggage inspection.  (Tr. at 31-33, 36-37, 76).  While Defendant's family sat in a passenger waiting area, Officer Morris asked Defendant to claim all of your bags and to bring them over to the baggage inspection belt.  (Tr. at 37).  Defendant grabbed all of the luggage and placed the bags on the inspection belt.[7]  (Tr. at 38).  In order to obtain a "binding declaration," Officer Morris asked Defendant if he claimed all of the bags, including those that appeared to be his wife's.  He did.  (Tr. at 38).  Officer Regas was still present.  (Tr. at 38).

Officer Morris again asked Defendant about the currency stating that he "just wanted to be sure you are telling us the truth, are you traveling with a hundred dollars?" Defendant responded, "Yes." (Tr. at 39).  Officer Regas stated to Defendant that if he did not claim currency, any amount over $10,000 was subject to seizure. Defendant again stated that he only had $100.  (Tr. at 39).  As the officers inspected the luggage, they spoke with Defendant about his travel.  In jeans found rolled up in a couple of the bags, the officers found bundles of currency that clearly exceeded $100. Officer Morris determined from his training that the amount exceeded $10,000.  (Tr.

---

[7]Officer Morris estimated that another fifteen minutes had elapsed.  (Tr. at 51).

6

at 40-42, 79-80).  Officer Morris advised Defendant that this is more than $100 and stated, "You did not declare this money."  (Tr. at 42).  Defendant then pulled out of his pockets two more CBP declaration forms and stated, "I did declare the money."  He also said, "That is my money, I declared it."  (Tr. at 42-44, 88-89; Gov't Exs. 3, 4).[8] During the initial examination of the luggage, the officers found $75,000 to $80,000 in currency.  (Tr. at 45).

At approximately 7:30 p.m., the officers placed a call to Immigration and Customs Enforcement ("ICE") Agent Leo Ford and advised him of finding the bulk cash currency which was standard procedure under the circumstances.  (Tr. at 45-46, 90-91).  Leaving Defendant's family seated in the waiting area, the officers asked Defendant to follow them to one of the interview rooms.  He complied.[9]  (Tr. at 46-47, 82).  While waiting for Agent Ford to arrive, at approximately 7:30 to 7:36 p.m., the officers conducted a pat down search of Defendant finding an additional bundle of

---

[8]The first declaration form is filled out, signed only with Defendant's first name, Stephen, and answered the question about having more than $10,000, no.  (Tr. at 43, 67; Gov't Ex. 3).  The second form is blank, not signed and on the back has $80,000 written next to the word, Total.  [Tr. at 44; Gov't Ex. 4].

[9]And Officer Morris estimated that approximately fifteen to twenty minutes had elapsed from the time Defendant first stood at the baggage inspection belt.  (Tr. at 52, 84).

7

$10,000 in currency in his coat pocket.[10]  (Tr. at 49, 54-55, 77, 109).  Besides asking

Defendant "why didn't you declare" the money – to which apparently no response was

made in addition to that noted *supra*, the officers did not speak with Defendant any

further.  (Tr. at 47, 85).  Defendant waited approximately forty-five minutes to an hour

in the interview room, with the door open, for Agent Ford to arrive.  (Tr. at 47, 52, 82).

Except for conducting the pat down of Defendant's person, as of this time, the

officers had not touched or physically restrained Defendant.  He was not handcuffed.

(Tr. at 49).  The officers were in uniform which had a badge and their uniform belt,

with a holstered firearm and handcuffs.  The officers did not draw attention to either

the firearms or handcuffs.  (Tr. at 47-48, 72).  Defendant was never advised that he was

under arrest or would be arrested.[11]   Defendant was not threatened.   (Tr. at 50).

Although Defendant was not free to leave at that time, he never attempted to leave and

---

[10]The officers transported the currency already found and the luggage to a
second interview room.  They conducted a second inspection and found additional
bundles of currency.  (Tr. at 55, 83).  In total, the officers seized $110,802 in currency
from the luggage and from Defendant's and his wife's persons and her purse.  (Tr. at
41, 85).

[11]The officers advised Defendant that he was in violation of Title 31 because he
did not declare the currency; therefore, the currency was subject to seizure.  (Tr. at 85-
86).  However, the officers did not threaten to take Defendant to jail or advise
Defendant that it was illegal to transport the currency.  (Tr. at 85).

was not told that he was not free to leave.  (Tr. at 50, 55-57).  Defendant did become

agitated, stating that this was taking too long.  He also asked why the officers were

taking his money and told the officers that they could not take the money.  (Tr. at 50,

77, 81).  Officer Morris testified, when asked if Defendant requested a lawyer, "Not

at all.  I never to the best of my recollection I do not recall him asking for an

attorney."[12]  (Tr. at 50-51, 77, 80).

Agent Ford recalled receiving a telephone call from the CBP officers between

7:00 and 7:30 p.m., on February 13, 2011, and arriving at the airport at approximately

8:15 p.m.  (Tr. at 91-92, 102).  After stopping by the ICE office to ask Task Force

Officer ("TFO") Gilden to accompany him to the Customs baggage control secondary

inspection area, Agent Ford went to that location and first spoke with the CBP officers

---

[12]In his post-hearing brief, citing to an affidavit that Defendant submitted in support of the motion to suppress, Defendant claims that the evidence establishes that he did ask to speak with an attorney.  [Doc. 13, Willoughby Affidavit, ¶ 8; Doc. 20 at 12].  Defendant's affidavit, however, is not evidence in the record before this court and will not be considered by the court in ruling on the motion to suppress.  See United States v. Smalls, 2010 WL 5071984, at *2 n.3 (S.D. Ga. November 18, 2010) ("'A defendant who wishes to dispute evidence offered by the government at a suppression hearing may not hope to avoid the cleansing fire of cross-examination by the simple expedient of tendering his testimony in the form of an affidavit.'") (quoting United States v. Terry, 2007 WL 496630, at *4 (S.D. Ga. February 12, 2007), aff'd, 258 Fed. Appx. 304 (11th Cir. 2007)); United States v. Hamilton, 2007 WL 2582233, at *1 n.1 (S.D. Ga. August 31, 2007) (same).

and examined the documents previously obtained from Defendant. (Tr. at 92-93, 103).

He entered the interview room to speak with Defendant at approximately 8:20 to 8:25

p.m.[13]   (Tr. at 93).   The agent and TFO were dressed in casual clothes with their

firearms and handcuffs concealed under their clothing.  They did not draw attention

to these items while speaking with Defendant. (Tr. at 94-95, 102).  Defendant was not

physically restrained, and neither the agent nor the TFO touched Defendant during the

interview.  (Tr. at 95-96).  They did not advise Defendant that he would be arrested or

booked or go to jail; they did not threaten Defendant; and they did not ask any

questions that implied that Defendant would be arrested.  (Tr. at 96, 106).  Agent Ford

stated that he generally made Defendant aware of the currency reporting requirements

and advised Defendant that failure to comply "could make him . . . could leave you

open to having your currency seized and/or subject to arrest. . . ."  (Tr. at 105).

Defendant was not told that he could not leave, and Defendant did not ask to leave or

attempt to leave.  Defendant did not ask to speak to an attorney.  (Tr. at 96, 98, 105).

Agent Ford interviewed Defendant, who was very agitated, for approximately twenty

---

[13]The room is approximately ten feet by fifteen feet, with a door that remained partially open, and windows.  Defendant was seated at a table along with Agent Ford. (Tr. at 97).  TFO Gilden stood near the door, and CBP Inspector Bundy, whose weapon was also concealed, stood off to the side as an observer.  (Tr. at 97, 102-03). Defendant's family remained seated in the waiting area.  (Tr. at 97-98).

10

to twenty-five minutes and then advised Defendant that he would be released once he signed the administrative paperwork relating to the seizure of the currency.[14]  (Tr. at 93-94, 98, 100-01, 104, 107).  The paperwork was completed, and Defendant and his family left the Customs area approximately three to three one-half hours after exiting the airplane.  (Tr. at 53-54).

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress.

**II.    Discussion**

Defendant seeks to suppress the evidence seized, including the currency, and the statements he made while in the Customs baggage control area of the HJIA on February 13, 2011.  [Doc. 20].  Defendant acknowledges that this area of the airport is the functional equivalent of the border which allows for routine inspections and questioning but contends that the circumstances on February 13, 2011, establish that this was a non-routine detention and questioning that required initially reasonable suspicion and then probable cause because Defendant was in custody and, likewise, required <u>Miranda</u> warnings before he was questioned.  [<u>Id.</u> at 6-16].  The Government

---

[14]Agent Ford testified that if anyone would have arrested Defendant, it would have been him because the CBP officers do not have arrest powers.  (Tr. at 98-99).

11

opposes the motion to suppress arguing that the events of February 13, 2011, constituted a routine border inspection and questioning that required neither reasonable suspicion nor probable cause and that <u>Miranda</u> warnings were not required because the interviews were not distinctly accusatory.  [Doc. 21 at 7-13].

### a.    Border Search

While the Fourth Amendment dictates that searches and seizures be reasonable, "[w]hat is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."  <u>United States v. Montoya De Hernandez</u>, 105 S. Ct. 3304, 3308 (1985).  Due to Congress' broad powers to police the border, <u>see</u> <u>United States v. Ramsey</u>, 97 S. Ct. 1972, 1978-79 (1977), "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior[,]" <u>Montoya</u>,105 S. Ct. at 3309.  As the Supreme Court recently reiterated:

> Time and time again, we have stated that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.". . . Congress, since the beginning of our Government, "has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to . . . prevent the introduction of contraband into this country."

12

United States v. Flores-Montano, 124 S. Ct. 1582, 1585 (2004) (citations omitted).

Therefore, although a defendant is entitled to be free from an unreasonable search and seizure, his expectation of privacy is less at the border, and "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." Montoya, 105 S. Ct. at 3309-10; see also United States v. Alfaro-Moncada, 607 F.3d 720, 728 (11th Cir. 2010) (same); United States v. Villabona-Garnica, 63 F.3d 1051, 1057 (11th Cir. 1995) ("Border searches are not subject to the probable cause and warrant requirements of the Fourth Amendment; rather, they are simply subject to that amendment's more amorphous reasonableness standard."). The HJIA, an international airport, is the functional equivalent of the border for passengers arriving at E concourse on international flights, see Denson v. United States, 574 F.3d 1318, 1339 (11th Cir. 2009), and United States v. Buonsignore, 131 Fed. Appx. 252, 257 (11th Cir. 2005); therefore, Defendant's expectation of privacy is greatly reduced due to the fact that he and his possessions "entered the United States from the outside[,]" United States v. Masesa, 218 Fed. Appx. 880, 882 (11th Cir. 2007).

Accordingly, no articulable suspicion is required for routine border searches, such as questioning, luggage searches and pat-downs or frisks, which only intrude

13

slightly on a person's privacy.  <u>See</u> <u>Alfaro-Moncada</u>, 607 F.3d at 728 (as part of a routine border search, a person may be subjected to a pat-down or frisk and his luggage inspected without any level of suspicion); <u>United States v. Glover</u>, 353 Fed. Appx. 314, 317 (11th Cir. 2009) (the CBP "officer may conduct routine questioning, check luggage, and conduct a pat-down search without any level of suspicion"); <u>Denson</u>, 574 F.3d at 1340 (preliminary border search may include routine questioning, examination of luggage and pat-downs or frisks); <u>Masesa</u>, 218 Fed. Appx. at 882 (same).  These searches can be legitimately conducted with no more than a generalized "mere suspicion" or "subjective response" of the border inspector, and in fact, "[a] person's decision to cross our national boundary is justification enough for such a search." <u>United States v. Vega-Barvo</u>, 729 F.2d 1341, 1345 (11th Cir. 1984); <u>see also</u> <u>Alfaro-Moncada</u>, 607 F.3d at 728; <u>Glover</u>, 353 Fed. Appx. at 317.

For highly intrusive detentions and searches at the border, the Supreme Court in <u>Montoya</u>, which involved an internal body smuggle of drugs, established a reasonable suspicion standard for the decision to detain an individual beyond the routine border search and inspection.  <u>See</u> 105 S. Ct. at 3310; <u>see also</u> <u>Glover</u>, 353 Fed. Appx. at 317 (same).  In <u>Villabona-Garnica</u>, the Eleventh Circuit Court of Appeals stated, "We have 'applied this reasonableness requirement by adopting a flexible test

14

which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search.'"  63 F.3d at 1057 (citation omitted).  For example, to conduct a strip search or an x-ray of an international traveler, officers must have articulable, reasonable suspicion of wrongdoing.  Denson, 574 F.3d at 1341 ("If, after conducting initial questioning and a preliminary search of the individual and the individual's effects, the officer has a reasonable suspicion that the traveler is smuggling drugs in her alimentary canal, the Fourth Amendment permits the Customs officer to detain the individual and conduct a more intrusive search."); Masesa, 218 Fed. Appx. at 882 ("a customs agent must have a reasonable suspicion before conducting a more intrusive, non-routine border search, such as an x-ray examination"); United States v. Rodriguez, 74 F.3d 1164, 1164-65 (11th Cir. 1996) (permitting government, upon establishing reasonable suspicion that traveler is internal drug smuggler, to "detain the traveler until enough time has passed to allow the contents of the suspected smuggler's stomach to be excreted").  As stated by the district court in Rahman v. Chertoff, 2010 WL 1335434 (N.D. Ill. March 31, 2010), "[t]hough 'routineness' ultimately depends on the facts surrounding each search, border search case law provides some guidance for making the determination[,]" all of which indicates that "the only border searches 'that have been consistently held to

15

be non-routine are strip-searches and body-cavity searches.'"[15]   Id., at *1 (quoting United States v. Braks, 842 F.2d 509, 512-13 (1st Cir. 1988)).

Defendant focuses on the events that occurred downstairs in Customs baggage control, after he contends that CBP Officer Morris determined that Defendant was not free to leave, as being non-routine.  [Doc. 20 at 8-9].  Contrary to the Defendant's claims, all of these actions by the officers constituted a routine border inspection and search - Defendant was questioned about his travel and the currency in his possession; his luggage was examined; and he was subjected to a brief pat-down.  After Defendant and his family arrived at the baggage carousal to claim their checked luggage, Officers Morris and Regas approached Defendant and his family and requested to examine Defendant's passport and CBP declaration form.  (Tr. at 23-24, 68).  Officer Morris inspected the CBP declaration form handed to him by Defendant (Gov't Ex. 2) and asked Defendant routine questions, such as, purpose of his travel and number of pieces of checked luggage.  (Tr. at 24-25, 70).  One of the CBP officers' duties is to verify the

---

[15]The court in Rahman provided a number citations finding that "searches of purses, wallets, computers and personal documents are considered routine[,]" as are "searches in which the entrant is fingerprinted or photographed" or involving "pat downs and searches that involve minimal force, including the brief use of handcuffs," and finding that "border detentions of up to six hours are considered routine."  Id., at *1 (citations omitted).  As the court noted, "[e]ven searches that have many of these features have been held to be routine."  Id. (citation omitted).

amount of currency flowing into and out of the United States because the transportation of currency could be linked to other criminal activity and, accordingly, one of the questions on the CBP declaration form asks whether the traveler is carrying in excess of $10,000.  (Tr. at 25-28; Gov't Ex. 2, 2a).  On the form handed by Defendant to Officer Morris, that question was checked, no.  (Tr. at 28; Gov't Ex. 2).  Officer Morris asked Defendant about the amount of currency he was traveling with in order to obtain a "binding declaration" and to allow Defendant to amend the form if any answers are incorrect.  (Tr. at 28).  Defendant "very quickly" responded, "$100."  (Tr. at 29).  Officer Morris asked Defendant to write on the back of the form the amount of currency he was carrying and then to sign the form.  Defendant did so.  (Tr. at 29, 71-72; Gov't Ex. 2).  The officer returned Defendant's passport and the CBP declaration form and walked away.  The officers maintained physical surveillance of Defendant.  (Tr. at 30, 73).

The officers next made contact with Defendant and his family as they waited at the baggage control checkpoint.  Defendant had handed his passport and the CBP declaration form to the officer at the checkpoint.  (Tr. at 30-31, 36, 74-75).  Officer Morris approached, obtained Defendant's passport and the CBP declaration form from the officer at the checkpoint and asked Defendant and his family to follow him to

17

secondary baggage inspection.  (Tr. at 31-33, 36-37, 76).  Neither Defendant nor his family had cleared Customs at this point and remained within the border control area. While Defendant's family sat in a passenger waiting area, Officer Morris, with Officer Regas present, asked Defendant to claim all of his bags and to bring them over to the baggage inspection belt.  (Tr. at 37-38).  Defendant grabbed all of the luggage and placed the bags on the inspection belt.  (Tr. at 38).  In order to obtain a "binding declaration," Officer Morris asked Defendant if he claimed all of the bags, including those that appeared to be his wife's.  He did.  (Tr. at 38).

Officer Morris again asked Defendant about the currency stating that he "just wanted to be sure you are telling us the truth, are you traveling with a hundred dollars?" Defendant responded, "Yes." (Tr. at 39).  Officer Regas stated to Defendant that if he did not claim currency, any amount over $10,000 was subject to seizure. Defendant again stated that he only had $100.  (Tr. at 39).  As the officers inspected the luggage, they spoke with Defendant about his travel.  In jeans found rolled up in a couple of the bags, the officers found bundles of currency that Officer Morris determined from his training exceeded $10,000.[16]  (Tr. at 40-42, 79-80).  Officer

---

[16]Although not necessary in this court's opinion because none of the events constituted a non-routine border inspection, the court notes that once the officers found the bundles of currency in the luggage, they clearly had a reasonable suspicion that

Morris advised Defendant that this is more than $100 and stated, "You did not declare this money." (Tr. at 42). Defendant then pulled out of his pockets two more CBP declaration forms and stated, "I did declare the money." He also said, "That is my money, I declared it." (Tr. at 42-44, 88-89; Gov't Exs. 3, 4).

After finding this bulk cash currency, which totaled approximately $75,000 to $80,000 in currency (Tr. at 45), the officers transported the currency already found and the luggage to a second interview room. They conducted a second inspection and found additional bundles of currency. (Tr. at 55, 83). In total, the officers seized $110,802 in currency from the luggage and from Defendant's and his wife's persons and her purse. (Tr. at 41, 85). Defendant was also asked to go to one of the interview rooms where he was subsequently questioned by Agent Ford, as will be discussed in detail *infra*. (Tr. at 46-47, 93-101).

Although Defendant makes much of the fact that Officer Morris testified that Defendant was not free to leave – not surprising as Defendant was an international passenger, within the functional equivalent of the border, and had not been cleared to

---

Defendant was engaged in conduct in violation of the currency reporting requirements of federal law and, therefore, had grounds for extending the border inspection, that is, conducting a pat down search of Defendant and his wife and conducting a further examination of the luggage which disclosed additional bundles of currency and, also, the questioning of Defendant by Agent Ford.

19

enter the United States, the facts establish that Defendant never asked or attempted to leave, or flee, that the officers never told Defendant that he could not leave, and that Defendant was never physically restrained or touched by the officers, except for the pat down search.  (Tr. at 49, 55-57).  Defendant did not ask to speak to an attorney. (Tr. at 50-51, 77, 80-81).  The officers, besides informing Defendant of the currency reporting requirements and the potential for civil seizure of any funds over $10,000 not reported, did not threaten Defendant and did not advise Defendant that he would be arrested or sent to jail.  (Tr. at 50, 85-86, 89).  In fact, the CBP officers do not have arrest authority.  (Tr. at 98-99).  The officers' firearms and handcuffs remained on their uniform belts, and although Defendant became agitated and loud, they maintained a calm and professional demeanor.  (Tr. at 47-48, 77, 81, 89).  From the point that the officers first approached Defendant and his family at the baggage carousal until completion of the first baggage inspection, approximately thirty to thirty-five minutes elapsed and about a hour to a hour and fifteen minutes had elapsed since Defendant was first contacted on the jet way.  (Tr. at 51-52).

Defendant's attempt to focus on whether the questioning and searches, including the luggage search and the pat-down, occurred at the secondary baggage inspection location instead of the primary inspection station is misplaced.  The location of the

20

border inspection is not significant in the analysis of the reasonableness of the officers' actions.  To the contrary, the proper inquiry focuses, as the Government argues, on the level of intrusion, which in this case did not exceed situations found repeatedly by courts to constitute routine border searches requiring no suspicion of criminal activity. Tabbaa v. Chertoff, 509 F.3d 89, 98 (2nd Cir. 2007) ("The determining factor is not how ordinary or commonplace a search is, but rather 'the level of intrusion into a person's privacy.'") (citation omitted); Vega-Barvo, 729 F.2d at 1344 ("As intrusiveness increases, the amount of suspicion necessary to justify the search correspondingly increases.").

In Masesa, the Eleventh Circuit Court of Appeals held that both the initial stop and the secondary inquiry "were part of the initial border investigation."  218 Fed. Appx. at 882.  The court stated that "[t]his second phase of inquiry was merely an extension of the initial border search. . . ." Id.; see also United States v. Jerome-Oboh, 883 F. Supp. 917, 922 (W.D. N.Y. 1995) (rejecting the defendant's argument that officers needed "requisite level of suspicion" to refer him to secondary inspection for a pat-down and stating that "'[t]he referral of a person entering this country to a secondary inspector is part of the 'routine' border interrogation'") (quoting United

States v. Henry, 604 F.2d 908, 920 (5th Cir. 1979), abrogated on other grounds United States v. Corral-Franco, 848 F.2d 536 (1988)).

In United States v. Switzer, 11 Fed Appx. 65 (4th Cir. 2001), the Fourth Circuit Court of Appeals refused to find that a pat-down search of the defendant at the secondary inspection site was non-routine requiring reasonable suspicion.  In Switzer, the defendant and a traveling companion were questioned based on "factors indicative of drug smuggling," and based on their demeanor and other factors arousing the officers' suspicions, the defendant and his companion were referred to secondary inspection for further questioning and a search of their luggage.  Id. at 65-66.  The search of the luggage disclosed drug paraphernalia, and the subsequent pat-down search of the defendant revealed controlled substances secreted in a fanny pack under his shirt.  Id. at 66.  The court held that the pat-down search was routine requiring no showing of reasonable suspicion.  Id.  And in United States v. Charleus, 871 F.2d 265 (2nd Cir. 1989), the Second Circuit Court of Appeals held that the "light touching of [the defendant's] back followed by the lifting of his shirt" during a secondary inspection did not require reasonable suspicion and constituted a routine border search. Id. at 268 (citing, e.g., Braks, 842 F.2d at 512-15 (while in a private room, lifting of skirt by the defendant to reveal a bulge of drugs in girdle was routine border search and

22

"did not necessarily require any degree of suspicion"); United States v. Oyekan, 786 F.2d 832, 835 (8th Cir. 1986) (pat-down followed by search of luggage and purse are routine border searches); United States v. Grotke, 702 F.2d 49, 51-52 (2nd Cir. 1983) (pat-down followed by removal of shoes is routine border search)).

Defendant was not subjected to any type of highly intrusive search, such as a strip search or an x-ray, nor to an unduly lengthy detention at the border requiring any level of suspicion.[17]  See Glover, 353 Fed. Appx. at 317; Villabona-Garnica, 63 F.3d at 1057.  For these reasons, the court finds that Defendant was subjected to a routine border inspection and interview not requiring any suspicion of criminal activity.  The court **RECOMMENDS** that Defendant's motion to suppress the evidence seized as a result of these searches be **DENIED**.

b.     Statements

In this case, as noted, Defendant was seeking admission into the United States at the functional equivalent of the border, see Buonsignore, 131 Fed Appx. at 257, and was being interviewed by CBP Officers and then Agent Ford as part of their responsibility in protecting the border in connection with that request, see United

---

[17]Again, as noted, once the bundles of currency were located in the luggage, the officers did have reasonable suspicion to further detain Defendant and his belongings for additional inspection and questioning.

23

States v. Garcia-Cordero, 610 F.3d 613, 618 (11th Cir. 2010) (discussing the requirements of 8 U.S.C. § 1324(a)(2)(B)(iii), the "bring and present" regulation, the court agreed with the Government's assertion "that identifying and questioning individuals who enter our country is essential to controlling our borders, which is a critical national security issue"). Although individuals "at the border are entitled to Miranda warnings before custodial interrogation[,]" the court's determination "whether interrogation is 'custodial' should be interpreted in the light of the strong governmental interest in controlling the borders." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996); accord United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (same).

Given this responsibility, the court in Moya stated:

[S]ome degree of questioning and of delay is necessary and is to be expected at entry points into the United States. Because of this expectation, questioning at the border must rise to a *distinctly accusatory level* before it can be said that a reasonable person would feel restraints on his ability to roam to the "degree associated with formal arrest." [Minnesota v.] Murphy, [104 S. Ct. 1136, 1144 (1984)]. We stress that events which might be enough often to signal "custody" away from the border will not be enough to establish "custody" in the context of entry into the country. This idea is consistent with cases involving facts similar to this one, which have indicated that a secondary interview is part of the border routine and does not require Miranda warnings.

24

74 F.3d at 1120 (emphasis added) (citing, e.g., <u>Henry</u>, 604 F.2d at 920 ("The referral of a person entering this country to a secondary inspector is part of the 'routine' border interrogation and does not, in and of itself, focus on the person so as to require a <u>Miranda</u> warning.")); <u>accord</u> <u>United States v. Medina</u>, 167 Fed. Appx. 161, 166 (11th Cir. 2006) (same); <u>McDowell</u>, 250 F.3d at 1362 (same); <u>and see</u> <u>Denson</u>, 574 F.3d at 1339 (preliminary border search may include routine questioning); <u>United States v. Hernandez</u>, 229 Fed. Appx. 331, 332 (5th Cir. 2007) ("Referral to secondary inspection at a border checkpoint does not constitute an arrest requiring <u>Miranda</u> warnings."); <u>Buonsignore</u>, 131 Fed. Appx. at 258 ("we have held that 'a secondary interview is part of the border routine and does not require <u>Miranda</u> warnings'") (citation omitted).

The courts in <u>McDowell</u> and <u>Moya</u> considered the following factors to determine that the defendant was not in custody when questioned at the border: (1) "he was not physically moved or restrained by officers during the interview," (2) "no handcuffs were employed and no guns were drawn," (3) "he was not booked or told of formal accusations, nor told that he was under arrest" (4) "he did not ask to leave and was not told that he was not free to do so," and (5) "he made no admissions during the interview that would have led a reasonable person in his place to conclude that he

25

would be arrested immediately."[18]  McDowell, 250 F.3d at 1362; see also Moya, 74 F.3d at 1119.  Applying these factors to this case indicates that Defendant was not subjected to custodial interrogation during the secondary interview with Officers Morris and Regas or with Agent Ford.

At the Customs baggage control checkpoint, Officers Morris and Regas obtained Defendant's passport and Customs declaration form from the checkpoint officer and requested that Defendant and his family, carrying their luggage, follow them to the baggage inspection area.  (Tr. at 32-33, 36-38, 75-76).  While Defendant's family sat in the passenger waiting area, Defendant, with all of the luggage, stood with the officers at the inspection belt.  (Tr. at 37-38).  After confirming that Defendant was claiming all of the luggage, Officer Morris again asked Defendant about the currency stating that he "just wanted to be sure you are telling us the truth, are you traveling with a hundred dollars?"  Defendant responded, "Yes."  (Tr. at 38-39).  Officer Regas

_____

[18]And, while noting that "there is no fixed limit to the length of questioning[,]" McDowell, 250 F.3d at 1363, the Eleventh Circuit Court of Appeals in both Medina and McDowell found that delays of one and a half hours and approximately four hours, respectively, did not cause the border inquiry to rise to the "accusatory level" requiring Miranda warnings.  Medina, 167 Fed. Appx. at 166; McDowell, 250 F.3d at 1363.  In this case, the total delay encountered by Defendant, including the time spent like all other arriving passengers in the primary immigration checkpoint and the baggage control checkpoint, was three to three and one-half hours.  (Tr. at 53-54).

26

stated to Defendant that if he did not claim currency, any amount over $10,000 was subject to seizure.  Defendant again stated that he only had $100.  (Tr. at 39).  As the officers inspected the luggage, they spoke with Defendant about his travel.  In jeans found rolled up in a couple of the bags, the officers found bundles of currency that Officer Morris could determine from his training that the amount exceeded $10,000.  (Tr. at 40-42, 79-80).  Officer Morris advised Defendant that this is more than $100 and stated, "You did not declare this money."  (Tr. at 42).  Defendant then pulled out of his pockets two more CBP declaration forms and stated, "I did declare the money."  He also said, "That is my money, I declared it."  (Tr. at 42-44, 88-89; Gov't Exs. 3, 4).

Except for conducting the pat down of Defendant's person, the officers did not touch or physically restrain Defendant.  He was not handcuffed.  (Tr. at 49).  Although the officers were in uniform which had a badge and their uniform belt, with a holstered firearm and handcuffs, they did not draw attention to either the firearm or handcuffs.  (Tr. at 47-48, 72).  The officers advised Defendant that he was in violation of Title 31 because he did not declare the currency; therefore, the currency was subject to seizure; however, the officers did not threaten to take Defendant to jail or advise Defendant that it was illegal to transport the currency.  (Tr. at 85-86).  Defendant was never advised that he was under arrest or would be arrested.  Defendant was not threatened.  (Tr. at

50).  Although Defendant was not free to leave at that time, he never attempted to leave and was not told that he was not free to leave.[19]  (Tr. at 50, 55-57).  Defendant did become agitated, stating that this was taking too long.  He also asked why the officers were taking his money and told the officers that they could not take the money.  (Tr. at 50, 77, 81).  Officer Morris testified, when asked if Defendant requested a lawyer, "Not at all.  I never to the best of my recollection I do not recall him asking for an attorney." (Tr. at 50-51, 77, 80).  All of Defendant's statements to Officers Morris and Regas are admissible.

And the following interview with Agent Ford likewise was not custodial.  After the initial baggage inspection, with Defendant's family remaining seated in the waiting area, the officers asked Defendant to accompany them to a nearby interview room to wait for the arrival of Agent Ford.  (Tr. at 45-47, 82).  Within an hour, the agent and a TFO arrived to speak with Defendant.  (Tr. at 52, 82, 91, 93).  The agent and TFO were dressed in casual clothes with their firearms and handcuffs concealed under their

---

[19]Although Defendant points to the fact that Officer Morris testified that Defendant was not free to leave the Customs area, what either Defendant or the officers subjectively believed about Defendant's freedom of movement is not relevant to the court's inquiry.  "The test is objective:  the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  McDowell, 250 F.3d at 1362.

28

clothing.  They did not draw attention to these items while speaking with Defendant. (Tr. at 94-95, 102).  The interview room was approximately ten feet by fifteen feet, with a door that remained partially open, and windows.  Defendant was seated at a table along with Agent Ford.  (Tr. at 97).  The TFO stood near the door, and CBP Inspector Bundy, whose weapon was also concealed, stood off to the side as an observer. (Tr. at 97, 102-03).  Defendant was not physically restrained, and neither the agent nor the TFO touched Defendant during the interview.  (Tr. at 95-96).  They did not advise Defendant that he would be arrested or booked or go to jail; they did not threaten Defendant; and they did not ask any questions that implied that Defendant would be arrested.  (Tr. at 96, 106).  Agent Ford stated that he generally made Defendant aware of the currency reporting requirements and advised Defendant that failure to comply "could make him . . . could leave you open to having your currency seized and/or subject to arrest. . . ." (Tr. at 105).  Defendant was not told that he could not leave, and Defendant did not ask to leave or attempt to leave.  Defendant did not ask to speak to an attorney.  (Tr. at 96, 98, 105).  Agent Ford interviewed Defendant, who was very agitated, for approximately twenty to twenty-five minutes and then advised Defendant that he would be released once he signed the administrative paperwork relating to the seizure of the currency.  (Tr. at 93-94, 98, 100-01, 104, 107).

AO 72A
(Rev.8/82)

The paperwork was completed, and Defendant and his family left the Customs area approximately three to three and one-half hours after exiting the airplane.  (Tr. at 53-54).  Nothing about these facts establish that the "questioning at the border . . . [rose] to a *distinctly accusatory level"* that would require Miranda warnings.  Moya, 74 F.3d at 1120 (emphasis added).

The fact that Agent Ford was an ICE special agent and was called to the airport as a result of the bulk cash currency being found by the CBP officers during their routine border inspection to conduct the secondary interview does not alter the finding of the court that Miranda warnings were not required.  Recently in United States v. Jayyousi, __ F.3d __, 2011 WL 4346322 (11th Cir. September 19, 2011), the Eleventh Circuit Court of Appeals found that an interview at the Chicago O'Hare International Airport, at the functional equivalent of the border, by agents with the Federal Bureau of Investigation ("FBI") was not custodial until the agents accused the defendant of engaging in conduct related to terrorist acts.  Id., at *21.  The defendant had been found in possession of $10,526 by CBP officers, although he only declared $8,000.  The officers then escorted the defendant to an interview room where FBI agents informed the defendant that they would like to speak with him and obtain his cooperation.  Id., at *20.  The agents spoke with the defendant for several hours,

30

including "express[ing] skepticism" about the defendant's statements regarding the currency and discussing in detail his travels.  Id.  The court held that the interview to that point, including confronting the defendant "about not telling the truth about the source and purpose of the money that he had failed to declare," was not custodial because "'[t]he substance of the questioning was not accusatory[.]'"  Id., at *21 (quoting McDowell, 250 F.3d at 1363).  The court treated the referral to a secondary interview by the FBI agents as part of the routine border interrogation not requiring Miranda warnings until the defendant was accused of terrorist activities.  Id., at *22. Likewise, the statements made by Defendant to Agent Ford during the secondary interview within the Customs baggage control area are admissible.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 13] to suppress evidence and statements be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

AO 72A
(Rev.8/82)

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 21st day of October, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

32